**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL A. STOUCHKO** | : | **Civil No. 1:12-CV-1318** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Rambo)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **MICHAEL J. ASTRUE** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.   Introduction

In this case the Court is called upon to consider whether substantial evidence supports an ALJ's denial of benefits to Mr. Stouchko, when the potential impact of his rapidly approaching 50th birthday was left unaddressed by the decision.  Finding that this unaddressed issue must be addressed, we recommend a remand for reconsideration of this case.

The Plaintiff, Michael A. Stouchko, appeals from an adverse decision denying his Title II and Title XVI applications for disability insurance benefits (DIB) and supplemental security income (SSI).  On June 10, 2008, the Plaintiff protectively filed a Title II and Title XVI applications for disability insurance benefits (DIB) and supplemental security income (SSI).  (Tr. 154-65)  In both applications, the Plaintiff

alleged that he was disabled beginning August 21, 2005, due to a cascading arrays of aliments including degenerative disc disease of the lumbar spine with radiculopathy; arthritis in his shoulders; obesity; depressive disorder; diabetes mellitus; blurry vision; migraines; hypertension; Osgood-Schlatter's disease; status-post gallbladder removal; a history of chest pain; limited use of his right hand, status-post carpal tunnel release; carpal tunnel syndrome; nerve damage in his legs; status-post hernia repair; right foot pain; uncontrolled diarrhea; and sleep disorder.  (Tr. 31-34) Following a hearing before an Administrative Law Judge (ALJ) on December 3, 2009, both applications were denied in a written decision dated February 5, 2010, approximately four months short of the Plaintiff's 50th birthday. (Tr. 29-41)  The Plaintiff sought, and was denied, review of the ALJ's decision by the Appeals Council. (Tr. 8-12,  22-25)

On July 9, 2012, the Plaintiff, through counsel, filed a Complaint in this Court appealing the final decision denying his application for benefits.  (Doc. 1)  The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  On September 17, 2012, Defendant filed an answer to the Plaintiff's complaint, together with a copy of the administrative record.  (Docs. 6, 7)  On December 3, 2012, the Plaintiff filed his brief.  (Doc. 10)  On February 1, 2013, the

Commissioner filed a brief.  (Doc. 13)  On February 18, 2013, the Plaintiff filed a reply.  (Doc. 14)  This appeal is now ripe for disposition.[1]

## II.   Statement of Facts and of the Case

### A.   Plaintiff's Background, Medical and Emotional Impairments

The Plaintiff, born on June 2, 1960, is a high school graduate with the abilities to read, write, speak, and understand the English language.  (Tr. 57, 61-62)  After high school he had some vocational training as an electrician, and received a certificate from Westside Tech.  (Tr. 61)  In a document he submitted to the Social Security Administration, the Plaintiff reported that he had past work experience as a truck driver and machinist. (Tr. 196-203)  At the hearing, an impartial vocational expert (VE) testified that the Plaintiff had past relevant employment[2] as a tractor trailer truck driver, a semi-skilled occupation with an medium exertion level;[3] and a

---

[1]Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  L.R. 83.40.1

[2] Past relevant employment in the present case means work performed by Plaintiff during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560, 404.1565, 416.960, and 416.965.

[3] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary or light work.  22 C.F.R. §§ 404.1567(c), and 416.967(c).

machinist, a skilled position with a medium exertion level.  (Tr. 91)

The Plaintiff testified at length regarding his physical limitations, stating that he has limited use of his right hand, blurry vision, and had his gallbladder removed after it "went bad." (Tr. 61, 63, 71) He reported suffering from several prior injuries, including two hernias, a crushed right foot, a cut tendon in his right hand, and bilateral carpal tunnel syndrome in his hands.  According to Stouchko these conditions were repaired surgically.  (Tr. 63-64, 75, 78)  In addition, the Plaintiff testified that in 2005 he tore several muscles in his back, and a tendon in his right shoulder.  (Tr. 64)  He also reported that his vertebrae are deteriorating, Id.; and described chronic migraines, uncontrollable diarrhea, and depression.  (Tr. 72, 74, 82).

The Plaintiff further testified that he experienced pain in his foot, the upper part of his legs, and his back; he walks with a cane, and wears glasses. (Tr. 64, 75, 210). He asserted that his back  injury was his most painful ailment, and that his pain increases with changes in temperature and weather.  (Tr. 212).  Further, the Plaintiff reported that pain from these various conditions prevented him from sleeping, and that he suffered from dizziness as a side-effect from his prescribed pain medications. (Tr. 63, 69)

The Plaintiff testified that he can stand, walk or sit for a maximum of twenty

4

minutes each before he needs to change positions or rest.  (Tr. 79-80)  He asserted

that he could not lift or carry more than five pounds, and had difficulty holding things

with his right (dominant) hand.  (Tr. 209)  He indicated that he relied on his wife and

son to perform all household chores.  (Tr. 80-81)  The Plaintiff reported that he had

a driver's license, but for the most part abstained from driving due to his vision

impairment; he relied instead on his wife for transportation.  (Tr. 59-60)   The

Plaintiff's wife testified at his hearing; her testimony was largely consistent with her

husband's, though she also noted some deterioration in the Plaintiff's memory.  (Tr.

85-90)

    The Plaintiff stopped working in September 30, 2005, due to a workplace

injury which aggravated a recurrent right hernia.  (Tr. 63, 238)  The Plaintiff's

medical records reflect that his hernia was surgically repaired on September 30, 2005.

(Tr. 229-30, 238-40)  The Plaintiff underwent a cholecystectomy in May 2006.  (247-

49)

    In 2006, the Plaintiff sought treatment for lower back pain; he reported that his

pain radiated from his lower back down through his legs causing both pain and

numbness.  An MRI and x-ray series taken on September 7, 2006, of the Plaintiff's

lumbar, and lumbosacral spine revealed mild spinal stenosis at L1-L2, moderate

spinal stenosis at L2-L3, minimal disc bulges at L3-L4 and L4-L5, a 7 mm left sided

disc herniation at L5-S1 that contacted the left S1 nerve root in the epidural space. There was no evidence of fracture or subluxation in the Plaintiff's lumbosacral spine. (Tr. 253-54) Additionally, the MRI of his lumbosacral spine showed mild multilevel endplate spur formation without significant intervertebral disc space narrowing. Id.

On October 17, 2006, the Plaintiff's treating physiatrist, William Prebola, M.D., reported to the Plaintiff's primary care physician that he had a disc herniation at L5-S1. (Tr. 387-88) Id. Dr. Prebola recommended that the Plaintiff should undergo outpatient physical therapy. In his letter, Dr. Prebola opined that the Plaintiff could not work. Id.

On November 15, 2006, the Plaintiff underwent electromyographic (EMG) testing. (Tr. 389-90) The EMG revealed evidence of left L1 radiculopathy. Id. There was no electrodiagnostic evidence of sensory neuropathy, myopathy, lumbosacral plexopathy, or personal nerve entrapment at the level of the fibular head. Id. The Plaintiff returned to Dr. Prebola on January 2, 2007, with complaints of ongoing back discomfort. (Tr. 391) Dr. Prebola, once again, noted that the Plaintiff remained disabled, and recommended that undergo two to four additional physical therapy sessions before transitioning to a home exercise program. Id.

On March 30, 2007, the Plaintiff was re-examined by Dr. Prebola. (Tr. 392) On examination, Dr. Prebola noted the Plaintiff had a "grossly" normal gait, which

was slightly antalgic on the left side.  Id.  He also observed diminished sensory function in the left dorsal aspect of the Plaintiff's foot.  Id.  Dr. Prebola recommended that the Plaintiff seek chiropractic care.  Id.  He also noted that there was no change in the Plaintiff's restrictions, and recommended a functional capacity evaluation after chiropractic treatments.  Id.

The Plaintiff subsequently returned to Dr. Prebola in July and November 2007. (Tr. 393-94)  Dr. Prebola noted no significant neurologic changes in the Plaintiff's condition, and no change in the Plaintiff's restrictions.  Id.  On January 29, 2008, Dr. Prebola noted that the Plaintiff had spasm across his lower back, a limp on his left side, and diminished sensation in the left L5 dermatome and left lateral calf area.  (Tr. 395)  He noted that the Plaintiff still had "sedentary to light duty restrictions."  Id. On June 12, 2008, Dr. Prebola noted that the Plaintiff had spasm across his lower back, was still limping on his left side, had unchanged sensory functions and reflexes. (Tr. 396)

On June 16, 2008, the Plaintiff was examined by Jigneshbhai Patel, M.D., as a new patient.  (Tr. 298-301)  On examination, Dr. Patel noted that the Plaintiff was fully oriented, had intact recent and remote memory, and normal insight, judgment, affect, and mood.  The Plaintiff's heart rate was also normal.  Id.  The Plaintiff had tenderness over L1-L5 of his lumbar spine, no paraspinal tenderness, a full range of

7

motion, no costovertebral angle (CVA) tenderness, and a negative straight leg raise test. Id. The Plaintiff's right shoulder showed mild tenderness without any swelling, erythema, muscle atrophy, or defects. Id. His range of motion was more restricted in his right shoulder, than in his left on terminal abduction. Id. Dr. Patel also observed that the Plaintiff's deep tendon reflexes (DTRs) were normal in his upper and lower extremities, and noted that this clinical finding was inconsistent with his reported history of decreased sensation in both lower extremities. Id. An MRI of the Plaintiff's lumbar spine, taken the same day, revealed: increasing disc degeneration at L1-L2 and L2-L3; a slight increase in disc herniation from L1-L2 through L4-L5; stable left lateral recess disc herniation at L5-S1; mild to moderate L1-L2 central spinal stenosis; moderate L2-L3 central spinal stenosis; mild L3-L4 central spinal stenosis; mild to moderate L4-L5 central spinal stenosis; and lateral recess effacement due to disc herniation. (Tr. 279-80)

On June 27, 2008, x-rays taken of the Plaintiff's right shoulder revealed that the bones and joints of his right shoulder were intact without fracture or abnormal displacement. (Tr. 293) There were no abnormal lytic or blastic changes, and no abnormal soft tissue calcification. Id. There were, however, degenerative changes to the Plaintiff's acromioclavicular (AC) joint. Id.

On July 29, 2008, the Plaintiff went to the emergency room with complaints of pain in his lower leg. (Tr. 314-24) He was diagnosed with a skin infection. Id. On examination, his attending physicians noted that the Plaintiff was alert and oriented with normal affect, insight and concentration, had no tenderness in his back, had a normal range of motion in his upper and lower extremities, and had no neurological deficits. Id. An x-ray taken of the Plaintiff's left knee yielded normal results, and noted that there was no bony abnormality, no joint effusion, and no abnormal lytic or blastic changes. (Tr. 324) On September 25, 2008, the Plaintiff was examined by Dr. Prebola, who recommended that the Plaintiff should not resume physical therapy until he gets clearance from cardiology and neurology. (Tr. 397)

Dr. Prebola's treatment records indicate that the Plaintiff had right shoulder surgery, performed by Dr. Mattucci, in December 2008; there is no other medical evidence in the record of this surgery. (Tr. 398) On examination Dr. Prebola noted that the Plaintiff had spasm in both lumbar paraspinals, and was still limping on his left side. Id.

On April 7, 2009, the Plaintiff underwent a left shoulder surgical arthroscopy performed by orthopedic surgeon James Mattucci, M.D. (Tr. 381) Dr. Mattucci also performed subacromial decompression and distal clavicle excision procedures on the Plaintiff's left shoulder. Id.

9

On June 25, 2009, the Plaintiff was examined by Dr. Prebola with complaints of ongoing pain in his groin, from his hernia, and lower back. (Tr. 399) On physical examination, Dr. Prebola noted that the Plaintiff had tenderness in the right groin and lateral abdominal region, and tenderness and spasm across his lower back. Id. A straight leg raise test was negative, and he still had an antalgic gait on the left side. Id.

On September 3, 2008, state agency medical consultant, Sharon Wander, M.D., assessed the Plaintiff's physical RFC after reviewing his available medical records. (Tr. 342-47) Dr. Wander opined that the Plaintiff could: occasionally lift or carry 20 pounds, and frequently lift or carry ten pounds; stand or walk for six hours per eight-hour workday; sit six hours per eight-hour workday; and, push or pull within the limits of his lifting restriction. Id. Further, Dr. Wander concluded the Plaintiff could: occasionally climb and stoop; and frequently balance, kneel, crouch, and crawl. Id. Dr. Wander assessed that the Plaintiff had no manipulative, visual, communicative, or environmental limitations. Id. The ALJ found the record supported a finding that the Plaintiff was more physically limited than Dr. Wander's assessment. (Tr. 39)

On October 25, 2009, John Citti, M.D., completed a residual functional capacity assessment. (Tr. 443-44) Dr. Citti opined that the Plaintiff could:

10

occasionally lift or carry ten pounds, and frequently lift or carry five pounds; stand for two hours at one time; sit for thirty minutes at one time; never bend; occasionally stoop, balance, manipulate objects with both hands, and raise his right arm over shoulder level; and frequently raise his left arm above shoulder level.  Id.  Dr. Citti assessed that the Plaintiff was in a moderate amount of pain, and needed to occasionally elevate his legs during the workday.  Id.  Dr. Citti opined that *if* the Plaintiff's back improved he *may* be able to work at some time in the future.  Id.  The ALJ accorded little weight to Dr. Citti's assessment because he did not submit any supporting treatment records, and the ALJ found his statement to be inconsistent with the objective medical evidence of record.  (Tr. 39)

On December 9, 2009, Dr. Mattucci completed a similar residual functional capacity assessment form.  (Tr. 383)  Dr. Mattucci opined that the Plaintiff could occasionally and frequently lift or carry five pounds; stand for four hours at one time, and stand for a maximum of six hours per workday; sit for four hours at one time, and sit for a maximum of eight hours per workday; and, occasionally use his arms above and below the shoulder level.  Id.  Dr. Mattucci opined that the Plaintiff suffered from a moderate amount of pain.  Id.  In his assessment, Dr. Mattucci noted that the Plaintiff had muscle atrophy, bursitis, tendonitis, and impingement syndrome in his left and right shoulders.  Id.  The ALJ assigned great weight to this opinion.  (Tr. 39)

11

On January 21, 2010, Dr. Prebola completed a similar form, in which he expressed a competing opinion regarding the Plaintiff's physical limitations. (Tr. 446-47)  Dr Prebola opined that the Plaintiff could occasionally lift or carry ten pounds, and frequently lift or carry two pounds; stand for fifteen minutes at one time; sit for thirty minutes at one time; occasionally bend, stoop, and raise his left or right arm above his shoulder; frequently balance; and constantly manipulate objects with his left or right hand. Id. Dr. Prebola opined that the Plaintiff was in severe pain, and could work no more than four hours per day. Id.  The ALJ accorded little weight to Dr. Prebola's opinion that the Plaintiff was disabled. (Tr. 39)

On September 2, 2008, a state agency psychologist, Paul A. Perch, Ed.D., completed a psychiatric review technique evaluation of the Plaintiff's mental impairment.  (Tr. 328-40)  Dr. Perch opined the Plaintiff had the medically determinable mental impairment of mild depressive disorder. Id.  In his assessment, Dr. Perch concluded that the Plaintiff's impairment caused: mild difficulty in the areas of daily living, maintaining social functions, and maintaining concentration, persistence, and pace. Id.  The Plaintiff had no documented episodes of decompensation. Id. The ALJ found that this opinion was supported by the objective medical evidence or record, and by the lack of mental health treatment records. (Tr. 39)

12

One week later, the Plaintiff sought mental health treatment at Community

Counseling Services (CCS).   (Tr. 350-66)   On his intake examination, a CCS

examiner noted that the Plaintiff was neatly groomed, had good hygiene, a fair

rapport, and a depressed mood with a bland and flat affect.  Id.  The examiner

reported the Plaintiff exhibited cooperative behavior, and had quiet, mumbled speech.

Id.  The examiner noted that the Plaintiff was fully oriented, had average intellect,

normal thought processes and thought content, and an intact memory.  Id.  The

Plaintiff also exhibited adequate insight, fair judgment, and present impulse control.

Id.  The examiner assigned the Plaintiff a  global assessment of functioning (GAF)

score of 55.[4]  The ALJ accorded little weight to the Plaintiff's GAF score because it

---

[4]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness.   Diagnostic and Statistical Manual of Mental Disorders, 32 -35(4th ed. text rev., 2000).  A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id.  The score is useful in planning treatment and predicting outcomes.  Id.  A score of 21-30 represents behavior considerable influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family  relations, judgment, thinking or mood.  Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  Id.  A GAF score of 51-60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  Id.  A GAF score of 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships.  Id.  A GAF score of 71-80 represents transient symptoms,

was based on one visit, and was inconsistent with the record as a whole.  (Tr.  39)

Treatment notes from subsequent counseling sessions revealed that the Plaintiff was

consistently aware, fully oriented, and demonstrated no loss of mental acuity.  (See

e.g. Tr. 409-10, 413, 415-16, 418, 421-24, 425-26)

At the hearing on December 3, 2009, the VE was asked to identify what work,

if any, could be performed by a hypothetical individual with the RFC to undertake

sedentary work as defined by the Social Security Regulations, except that his ability

to work at that level was reduced in that he must be afforded the option to sit and

stand at will, and is limited to occupations that require no more than:  occasional

stooping, crouching, climbing ramps and stairs; occasional pushing an pulling with

his upper extremities, which includes the operation of hand levers, but cannot perform

overhead work; and simple, routine tasks not performed in a fast-paced production

environment involving only simple work-related decisions and in general, relatively

few workplace changes.  (Tr. 92-93)  The hypothetical further noted that this

individual would have to  avoid occupations that require: climbing ladders, ropes or

scaffolds; concentrated and prolonged exposure to temperature extremes; extreme

dampness; humidity; exposure to hazards, such as dangerous machinery and

_____

if present, and expectable reactions to psychosocial stressors or no more than slight
impairment in social, occupational, or school functioning.  Id.

unprotected heights; and, cannot balance, kneel or crawl, and was limited to occupations that could be performed while wearing an incontinence protection pad, due to uncontrollable diarrhea.  Id.  The VE responded that such an individual could not perform the Plaintiff's past relevant work, but could perform unskilled jobs at a sedentary exertion level, such as:  visual inspector, with 17,290 jobs existing in Pennsylvania and 467,010 nationally; assembler, with 9,070 jobs existing in Pennsylvania, and 318,060 nationally; and surveillance monitor, with 36,000 jobs existing in Pennsylvania, and 85,440 nationally.  (Tr. 93-94)

## B.     The ALJ's Decision

In her decision, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010,[5] and went through each step of the five-step sequential evaluation process and found:  (1) the Plaintiff had not engaged in substantial gainful activity since August 21, 2005, (Tr. 31); (2) the Plaintiff's alleged impairments of degenerative disc disease of the lumbar spine with radiculopathy, arthritis in the shoulders, and obesity were severe.  Id.; (3)

---

[5]Disability insurance benefits (DIB) are paid to an individual if that individual is disabled, and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that an individual meets the requirements of being insured is commonly referred to as the "date last insured."  Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues, designed to help aged, blind, and disabled individuals who have little or no income.  Unlike DIB, SSI does not require that an individual is "insured."

the Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, (Tr. 34); (4) the Plaintiff was unable to perform his past relevant work as a truck driver and machinist, (Tr. 39); and (5) the Plaintiff could perform a limited range of sedentary work.[6] (Tr. 35-41)  In reaching her decision, the ALJ concluded that the Plaintiff was a "younger" individual, that several of his alleged impairments, including depression, were non-severe, accorded limited weight to the medical

_____

[6]The ALJ found that the Plaintiff had the RFC to perform sedentary work as defined by the Social Security Regulations, except that his ability to work at that level was reduced in that he must be afforded the option to sit and stand at will, and is limited to occupations that require no more than: occasional stooping, crouching, climbing ramps and stairs; occasional pushing an pulling with his upper extremities, which includes the operation of hand levers, but cannot perform overhead work; and simple, routine tasks not performed in a fast-paced production environment involving only simple work-related decisions and in general, relatively few workplace changes. (Tr. 35)  The ALJ also found that the Plaintiff must avoid occupations that require: climbing ladders, ropes or scaffolds; concentrated and prolonged exposure to temperature extremes; extreme dampness; humidity; exposure to hazards, such as dangerous machinery and unprotected heights. Id.  Further, the ALJ concluded that the Plaintiff cannot balance, kneel or crawl, and was limited to occupations that could be performed while wearing an incontinence protection pad, due to uncontrollable diarrhea. Id.

Sedentary work is defined as work which involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  22 C.F.R. §§404.1567(a), and 416.967(a).

opinion of treating physiatrist Dr. Prebola, and found that hearing testimony by the Plaintiff, and his wife, was not entirely credible.

At the time of these proceedings, however, Mr. Stouchko was within months of his 50th birthday, an age factor which would have significance in the ALJ's disability assessment since he was on the borderline of qualifying as a "person closely approaching advanced age" (ages 50 through 54).  See 20 C.F.R. §§ 404.1563, and 416.963.  Because a claimant's age category could have a decisive impact on the ALJ's findings, especially in "borderline situations," "when there would be a shift in results caused by 'the passage of a few days or months,'" SSR 82-46c, the ALJ is obligated to  apply age categories in a non-mechanical fashion in borderline cases after evaluating "the overall impact of all the factors" of the case.  20 C.F.R. §§ 404.1563, and 416.963.  In this case, the ALJ's opinion did not acknowledge Stouchko's borderline status, or conduct any explicit analysis of this borderline status in concluding that Stouchko was not disabled.

On appeal, the Plaintiff has focused upon this omission and other alleged errors to argue that:  (1) the ALJ failed to adequately explain her application of the age categories under the medical-vocational guidelines; (2) the ALJ erred in finding that his depression was a medically determinable, but non-severe impairment; (3) the ALJ failed to accord sufficient weight to the medical opinion of Dr. Prebola; and (4) the

ALJ failed to adequately explain his determination that the Plaintiff and his wife were only partially credible.

## III.  Discussion

### A.  Standards of Review–The Roles of the Administrative Law Judge and This Court

#### 1.  Initial Burdens of Proof , Persuasion and Articulation for the ALJ

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the administrative law judge (ALJ) and this Court.  At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits.  To receive benefits, a claimant must present evidence which demonstrates that the claimant has an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A).

Furthermore,

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his

18

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A); <u>see also</u> 42 U.S.C. § 1383c(a)(3)(B).

In making this determination the ALJ employs a five-step evaluation process to determine if a person is eligible for disability benefits.  <u>See</u> 20 C.F.R. §§ 404.1520, and 416.920.  If the ALJ finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.   <u>See</u> 20 C.F.R. §§ 404.1520(a)(4), and 416.920(a)(4).  As part of this analysis the ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity;[7] (2) whether the claimant has a severe impairment;[8] (3) whether the claimant's impairment

---

[7] Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, and 416.910.

[8]The determination of whether a claimant has any severe impairments at step two of the sequential evaluation process is a threshold test.  20 C.F.R. §§ 404.1520(c), and 416.920(c).  If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. <u>Id.</u>  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(e), and 416.920(d)-(e).  Furthermore,

meets or equals a listed impairment;[9] (4) whether the claimant's impairment prevents the claimant from doing past relevant work;[10] and (5) whether the claimant's impairment prevents the claimant from doing any other work.  See 20 C.F.R. §§ 404.1520, and 416.920.

Before completing step four of this process, the ALJ must also determine the claimant's residual functional capacity (RFC).  20 C.F.R. §§ 414.1520(e), and 416.920(e).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm. of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 22 C.F.R. §§ 404.1545, and

---

all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923, and 416.945(a)(2).  An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant's ability to perform basic work activities is more than slight or minimal.  Basic work activities include the ability to walk, stand, sit, lift, carry, push, reach, climb, crawl, and handle. 20 C.F.R. §§ 404.1545(b), and 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers, and work pressures.  20 C.F.R. §§ 404.1545(c), and 416.945(c).

[9]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. 20 C.F.R. §§ 404.1520(d), and 416.920(d).  If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation proceeds to the next step. 20 C.F.R. §§ 404.1520(e), and 416.920(e).

[10]If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(f), and 416.920(f).

416.945; SSR 96-8p.  In making this assessment, the ALJ considers all of the claimant's impairments, including any medically determinable non-severe impairments.  22 C.F.R. §§ 404.1545 (a)(2), and 416.945(a)(2).

This disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he is unable to engage in past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  20 C.F.R. §§ 404.1520(g), 404.1566-69, 416.920(g), and 416.966-69; see also Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

The ALJ's disability determination must also meet certain basic procedural and substantive requisites.  Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination.  Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707.  In addition, "[t]he ALJ must indicate

in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### 2. Guiding Principles on the Application of the Age Categories Under the Medical-Vocational Guidelines

To aid the inquiry of residual work abilities required at step five of the sequential evaluation process, the Secretary has promulgated guidelines on disability determinations that account for four factors; a claimant's physical abilities, age, education, and work experience. See 20 C.F.R., Part 404, Subpart P, Appendix 2. The grids relieve the Commissioner of the need to rely on vocational experts by establishing, through rulemaking, the types and numbers of jobs that exist in the national economy where a claimant's qualifications correspond to the job requirements identified by a particular rule. Heckler v. Campbell, 461 U.S. 458, 461-62 (1983). The grids, however, were not intended to govern all cases. Id. at 462 n. 5.

To apply the age factor, the ALJ must place the claimant in one of three categories: "younger person" (under 50 years old); "person closely approaching advanced age" (ages 50 through 54); or "person of advanced age" (age 55 and older). See 20 C.F.R. §§ 404.1563, and 416.963. What differentiates these categories is the degree to which a claimant's age is presumed to affect his ability to adjust to other work. Kane v. Heckler, 776 F.2d 1130, 1134 (3d Cir. 1985). Where a claimant is a

"younger person" his age is not considered as a factor that seriously affects his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c), and 416.963(c). However, where a person is "closely approaching advanced age" or is of "advanced age," his age may "seriously" or "significantly" affect his ability to adjust to other work. 20 C.F.R. §§ 404.1563(d)-(e), and 416.963(d)-(e). Thus, because a claimant's age category affects where he falls within the grids, his age could have a decisive impact on the ALJ's findings, especially in "borderline situations."

"A 'borderline situation' exists when there would be a shift in results caused by 'the passage of a few days or months.'" SSR 82-46c. When such circumstances exist, the ALJ is obligated to apply age categories in a non-mechanical fashion after evaluating "the overall impact of all the factors" of the case. 20 C.F.R. §§ 404.1563, and 416.963. In Kane v. Heckler, the Third Circuit observed:

> The plain meaning of §404.1563(a) is that where the claimant's age falls within, in the Secretary's words, a "few months" of the starting date of an age category the grids should not be employed mechanically. There is an assumption inherent in the grids that persons within those categories have certain capabilities, but in a "borderline situation" this assumption becomes unreliable and a more individualized determination is necessary. '[I]t must be kept in mind that the grids do not govern– and indeed were not intended to govern– *all* disability cases.' Santise v. Schweiker, 676 F.2d 925, 934 (3d Cir. 1982)(emphasis in original), cert denied, 461 U.S. 911, 103 S.Ct. 1889, 77 L.E.2d 280 (1983).

776 F.2d at 1133. Furthermore,

> The few courts to address a mechanical application of the age categories in a borderline situation have remanded the cases to the SSA for more individualized determinations. Chester v. Heckler, 610 F.Supp. 533, 534-35 (S.D.Fla. 1985)(claimant's 50th birthday was 30 days after the expiration of insured status)' Ford v. Heckler, 572 F.Supp. 992, 994 (E.D.N.C. 1983)(claimant was two months from 45th birthday when ALJ decided and 15 days shy when Appeals Council ruled); Hilliard v. Schweiker, 563 F.Supp. 99, 101-02 (D.Mont. 1983)(ALJ ruled 88 days before claimant's 55th birthday).

Id. See also Lucas v. Barnhart, 184 Fed. Appx. 204, 207 (3d Cir. 2006)(non-precedential).

### 3.   Guidelines for Assessing the Severity of Impairments at Step Two of the Sequential Evaluation Process

At step two of the sequential evaluation process, the ALJ considers whether a claimant's impairment is (1) medically determinable or non-medically determinable, and (2) severe or non-severe; this step is essentially a threshold test.  20 C.F.R. § 404.1520.  The Third Circuit has observed that "[t]he burden placed on an applicant at step two is not an exacting one." McCrea v. Comm. of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).  Moreover, any doubt as to whether a claimant has made a sufficiency showing of severity at step two should be resolved in favor of the applicant.  Id.

If a claimant has no impairment or combination of impairments which significantly limits his physical or mental abilities to perform basic work activities, e.g. an impairment that is both medically determinable and severe, the claimant will

be found "not disabled" and the evaluation process ends at step two. Id. If, however,

the claimant has *any* medically determinable impairment that is severe, the evaluation

process continues. Id. Furthermore,

> [E]ven if an ALJ erroneously determines at step two that one impairment
> is not "severe," the ALJ's ultimate decision may still be based on
> substantial evidence if the ALJ considered the effects of that impairment
> at steps three through five. However, where it appears that the ALJ's
> error at step two also influenced the ALJ's RFC analysis, the reviewing
> court may remand the matter to the Commissioner for further
> consideration. See Nosse v. Astrue, No. 08-[CV-1173, 2009 WL
> 2986612, *10] (W.D.Pa. Sept. 17, 2009).

McClease v. Comm. of Soc. Sec., No. 8-CV-1673, 2009 WL 3497775, *10 (E.D.Pa.

Oct. 28, 2009); see also Salles v. Comm. of Soc. Sec., 229 F.Appx. 140, 145, n.2 (3d

Cir. 2007)(citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005)("Because

the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that

some of her impairments were non-severe, any error was harmless.").

### 4.   Legal Benchmarks for Assessing Treating Physician Opinions

It is beyond dispute that, in a social security disability case, the ALJ's decision

must be accompanied by "a clear and satisfactory explication of the basis on which it

rests." Cotter, 642 F.2d at 704. This principle applies with particular force to the

testimony of a treating physician, testimony that is to be accorded great weight by the

ALJ. In this regard, the legal standards governing our evaluation of this type of

evidence are familiar ones.  In Morales v. Apfel, 225 F.3d 310  (3d Cir. 2000), the

Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion

of a physician stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Plummer [v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)] (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987)); see also Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir.1994);  Jones, 954 F.2d at 128; Allen v. Bowen, 881 F.2d 37, 40-41 (3d Cir.1989);  Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Brewster, 786 F.2d at 585.  Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).  The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled.  See Adorno, 40 F.3d at 48.  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.  Plummer, 186 F.3d at 429; Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Kent, 710 F.2d at 115.

Id. at 317-318.

Furthermore, when assessing competing views of treating and non-treating

physicians, the ALJ and this Court are cautioned that:

> [A]n ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence. Ferguson, 765 F.2d

26

at 37 (1985).  When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993).  The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects.  See Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir.1983).  Treating physicians' reports should be accorded great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987); 20 C.F.R. § 404.1527(d)(2) (providing for controlling weight where treating physician opinion is well-supported by medical evidence and not inconsistent with other substantial evidence in the record.)  An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.  Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir.1985).

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999).

Similarly, the Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it is to be given controlling weight.  20 C.F.R. §§ 404.1527(c)(2), and 416.927(c)(2).  When the opinion of a physician is not given controlling weight, the length of the treatment relationship and the frequency of examination must be considered.  The Regulations state:

Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a

27

number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source.

20 C.F.R.  §§ 404.1527(c)(2)(I), and  416.927(c)(2)(I).

Additionally, the nature and extent of the doctor-patient relationship is considered.  The Regulations state:

Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

20 C.F.R.  §§ 404.1527(c)(2)(ii), and 416.927(c)(2)(ii).  Non-controlling medical opinions by treating sources are also accorded more or less weight based on the extent to which the medical source presents relevant evidence in support of the opinion, and based upon the extent to which it is consistent with the record as a whole.  20 C.F.R. §§ 401.1527(c)(3)-(4), and 416.927(c)(3)-(4).

Given this recognition of the great weight that should attach to the professional judgment of treating physicians, it is axiomatic that an ALJ must provide an adequate

explanation for any decision which chooses to disregard a treating physician's findings regarding illness, impairment and disability.   Moreover, when an ALJ fails to adequately explain why a treating physician's medical assessment has been discounted, a remand for further development of the factual record is proper.  See e.g., Burnett, 220 F.3d at 119 (failure to adequately discuss compering medical evidence compels remand of ALJ decision); Schaudeck, 181 F.3d at 433; Allen v. Brown, 881 F.2d 37, 40-41 (3d Cir. 1989); Belotserkovskaya v. Barnhart, 342 F.Supp.2d 335 (E.D. Pa. 2004).   Thus, as one court has aptly observed:

> "An ALJ may not reject a physician's findings unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir.1993) (internal quotation marks, citations and indication of alteration omitted).  Where the findings are those of a treating physician, the Third Circuit has "long accepted" the proposition that those findings "must [be] give[n] greater weight ... than ... the findings of a physician who has examined the claimant only once or not at all." Id. (citations omitted)  An ALJ may reject a treating physician's opinion on the basis of contradictory medical evidence, see Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988), and may afford a medical opinion more or less weight depending upon the extent to which supporting explanations are provided, see Mason, 994 F.2d at 1065 ("[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best"), and whether the reporting doctor is a specialist, see Id. at 1067.  An ALJ may not, however, reject medical determinations by substituting his own medical judgments. See Frankenfield, 861 F.2d at 408.

Terwilliger v. Chater, 945 F.Supp. 836, 842-3 (E.D.Pa.1996).

### 5.      Guidelines for Assessment of the Disabling Effect of Pain

Moreover, where a disability determination turns on an assessment of the level of a claimant's pain, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. §§ 404.1529, and 416.929.  Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  Cases involving an assessment of subjective reports of pain "obviously require[ ]" the ALJ "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."  Id.

In making this assessment, the ALJ is guided both by statute and by regulations. This guidance eschews wholly subjective assessments of a claimant's pain.  The ALJ is admonished that an "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which,

30

when considered with all the evidence. . . , would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

Applying this statutory guidance, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. §§ 404.1529, and 416.929. Under these regulations, first, symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), and 416.929(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. §§ 404.1529(b), and 416.929(b). In so doing, the medical evidence of record is considered along with the claimant's statements. Id. Social Security Ruling 96-7p gives the following instructions in evaluating the credibility of the claimant's statements regarding his symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree

to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. Additionally, SSR 96-4p provides that:

Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s).

SSR 96-4p.

### 6.     **Judicial Review of ALJ Determinations–Standard of Review**

Once the ALJ has made a disability determination, it is then the responsibility of this Court to independently review that finding.  In undertaking this task, this Court applies a specific, well-settled and carefully articulated standard of review. Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g); see also 42 U.S.C. § 1383(c)(3).

The "substantial evidence" standard of review prescribed by statute is a deferential standard of review. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). When reviewing the denial of disability benefits, we must simply determine whether

the denial is supported by substantial evidence.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); see also Johnson v. Comm. of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Johnson, 529 F.3d at 200 (quoting Hartranft, 181 F.3d at 360); see also  Pierce v. Underwood, 487 U.S. 552 (1988).  It is less than a preponderance of the evidence but more than a mere scintilla of proof.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer, 186 F.3d at 427 (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).  Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record

but rather must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968,

970 (3d Cir. 1981).

**B.**     **The ALJ's Application of the Age Categories under the Medical-Vocational Guidelines is Not Adequately Explained**

In his first argument, the Plaintiff contends that the ALJ erred in the first step

of her application of the medical-vocational guidelines by failing to adequately

explain her classification of the Plaintiff as a "younger person" under the medical-

vocational guidelines.  (Doc.10 pp.5-10)  The Commissioner responds that the ALJ

properly applied the medical-vocational guidelines in a non-mechanical fashion as

she used them as a framework, and elicited VE testimony to conduct an

individualized review of the impact of the Plaintiff's limitations on his ability to

work.  (Doc. 13 p. 12)

Where, as here, an individual has an impairment or combination of impairments

resulting in both exertional and non-exertional limitations, the Social Security

Regulations articulate what is essentially a two-step process to evaluate the effect of

a Plaintiff's combined limitations on his ability to work.  Under these regulations,

first, the ALJ must apply the medical vocational guidelines to determine whether a

finding of disabled may be possible based on exertional limitations alone; where a

claimant is found disabled under the guidelines based on his exertional impairments

34

alone, the analysis ends at step one.  20 C.F.R. Part 404, Subpart P, Appendix 2,

Section 200(e)(2).  If such an individual cannot be found disabled based on strength

limitations alone, the ALJ must proceed to the second step and, using the grids as a

framework, assess whether the individual's non-exertional impairments significantly

erode his occupational base.  See SSR 83-14.

The Plaintiff alleges an error occurred in the ALJ's initial application of the

guidelines.  The ALJ found that, "if the claimant had the RFC to perform a full range

of sedentary work, a finding of 'not disabled' would be directed by Medical-

Vocational Rule 201.21." (Tr. 40)  Rule 201.21 applies only to claimants under age

50.  It is undisputed that, on the date of the ALJ's decision, the Plaintiff was within

four months of the starting date of the "closely approaching advanced age" category.

Moreover, the Plaintiff aptly notes that consideration as an individual "closely

approaching advanced age" could shift the outcome of his case if medical-vocational

Rule 201.14 is applied.[11]  (Doc. 10 p. 6)  As discussed above, where a claimant's age

falls within a few months of the starting date of a new age category which could shift

the result, the ALJ is obligated to apply age categories in a non-mechanical fashion

---

[11]Rule 201.14 is identical to Rule 201.21 except that it applies to individuals
"closely approaching advanced age."

after evaluating "the overall impact of all the factors" of the case.  20 C.F.R. §§ 404.1563, and 416.963.

Here, the ALJ's decision fails to provide any explanation as to whether the Plaintiff was entitled to consideration under Rule 201.14 as a borderline age case.  An ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704.  The Court of Appeals has pointed out, absent such explanation, the court is "handicapped" because it is "impossible to determine whether the ALJ's finding ... is supported by substantial evidence." Fargnoli v. Halter, 247 F.3d 34, 40 (3d Cir. 2001).  Because the record does not contain factual findings relevant to the § 404.1563(b) inquiry into whether the Plaintiff was entitled to consideration under Rule 201.14, we conclude that the Commissioner's decision to deny his applications for benefits lacks sufficient explanation to permit review by this Court.  Moreover, to the extent the Commissioner asserts that reliance on VE testimony cures an ALJ's error in properly identifying, and explaining, her application of the medical-vocational guidelines in a borderline case, we disagree.  See Lucas, 184 Fed. Appx. at 207 ("Even if factually related, the issue of ability to adjust as an adjunct of age is legally and analytically distinct from the inquiry into whether one can perform a significant number of ... jobs in the national economy.").  Accordingly, because the ALJ failed to provide sufficient

explanation to allow this Court to conduct a meaningful review of whether the Plaintiff was entitled to consideration under Rule 201.14, we recommend that this case be remanded.

We also note that, beyond this confusion regarding the Plaintiff's borderline status, the parties have disputed whether the ALJ properly assessed the competing medical evidence in this case which predated Stouchko attaining borderline status. Since we find that a remand is compelled on this borderline status assessment issue, we believe on remand that the ALJ should also be free to re-examine these issues as well once the ALJ completes a full assessment of the degree to which Stouchko's borderline status affects the standard of review to be applied to this disability application.

## IV.   <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner be VACATED, and this case be REMANDED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the

37

proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 21st day of February, 2014.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge